## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **3:22-CR-00309** |
| | : | **(JUDGE MARIANI)** |
| **DAVID WATSON,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

Before the Court is Defendant David Watson's "challenge to the voluntariness" of certain statements and/or confessions made to Pennsylvania State Police officers in alleged violation of the Fifth Amendment to the United States Constitution. More specifically, Defendant seeks to suppress certain statements made to Corporal Francis Carito because Mr. Watson claims any statements and/or confessions were neither Mirandized nor voluntary in violation of his rights to due process and his privilege against self-incrimination under the Fifth Amendment.

Outside the presence of the jury, the Court heard testimony on October 7, 2025, from Defendant David Watson and Corporal Carito and both the defense and prosecution presented evidence and argument in support of their respective positions. The Court further had the opportunity to question Mr. Watson and Corporal Carito, observe both witnesses, and make credibility determination. For the reasons that follow, the Court will deny Defendant's motion to suppress because the Government has demonstrated that the totality of the circumstances compel a finding that any statements and/or confessions by Mr.

Watson was made knowingly and voluntarily and not in violation of Mr. Watson's Fifth Amendment rights.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461 (1966)). The Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as the "*Miranda* warnings," a defendant in police custody must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Id*. at 479.

The Fifth Amendment to the United States Constitution also protects a defendant's due process rights, including protection against the federal government's use of involuntary and coerced statements or confessions. *Withrow v. Williams*, 507 U.S. 680, 683 (1993)*; see also United States v. Griggie*, 105 Fed. App'x 431, 435 (3d Cir. 2004) ("According to the

Supreme Court, 'coercive policy activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause.'") (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *United States v. Swint*, 15 F.3d 286 (3d Cir. 1993) (same).

The standard for assessing whether a statement or confession is made voluntarily is well-settled. The Court must consider the totality of the circumstances, including "the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; physical condition; and mental health." *Withrow*, 507 U.S. at 683. Consideration of the totality of the circumstances "also includes the failure of police to advise the defendant of his right to remain silent and to have counsel present during custodial interrogation." *Id.* at 683-84.

Applying the totality of the circumstances to determine whether Mr. Watson's statements and/or confessions were made knowingly and voluntarily, the Court finds that the Government has proven by a preponderance of the evidence that any statements and/or confessions made by Mr. Watson were made knowingly and voluntarily. *See Swint*, 15 F.3d at 289 (recognizing that the government has the burden of proving, by a preponderance of the evidence, that the defendant's confession or statements were voluntarily given). Consideration of those statements and/or confessions do not violate Mr. Watson's Fifth Amendment due process rights or his privilege against self-incrimination.

First, there is no evidence whatsoever of police coercion.  Such coercive activity includes "trickery, psychological pressure, or mistreatment." *Withrow*, 479 U.S. at 167.  Mr. Watson did not offer any credible testimony that he was coerced by any of the police officers.[1]  Mr. Watson acknowledged that no officer physically assaulted, injured him in way, or otherwise mistreated him.  Unofficial Hr'g Tr. at 18:11-19.  Corporal Carito confirmed Mr. Watson's testimony on these issues as well, and further represented that no officer threatened Mr. Watson.

It is undisputed that on July 26, 2022, at 1:30 a.m. Mr. Watson signed a form and waiver from the Pennsylvania State Police entitled "RIGHTS WARNING AND WAIVER."  Gov't Ex. 22.  The form further provided:  "You have an absolute right to remain silent and anything you say can and will be used against you in a court of law.  You also have the right to talk to an attorney before and have an attorney present with you during questioning.  If you cannot afford to hire an attorney, one will be appointed to represent you

---

[1]      The Court further finds that Mr. Watson was not credible on the issue of his cellular telephone and that his testimony was inherently contradictory. Unofficial Hr'g Tr. at 30:1-8.  It is simply not believable that the officers obtained numbers from his cellphone for "T" and "Kyree" without Mr. Watson's consent, as the testimony at trial revealed that officers were unable to open Mr. Watson's phone for at least one month after his interrogation.  Unofficial Hr'g Tr. at 30:16-32:22.  Moreover, it is simply not credible that the officers obtained the cellular telephone numbers for "T" and "Kyree" from two separate sweatshirts located in Mr. Watson's rental vehicle. Unofficial Hr'g Tr. at 32:23-33:10.  The Court credits Corporal Carito's testimony on the cellular telephone issue. Unofficial Hr'g Tr. at 42:19-44:11.  That is, Corporal Carito credibly testified that he obtained the numbers for "T" and "Kyree" voluntarily from Mr. Watson after Mr. Watson signed the Miranda waiver form and opened up his phone. *Id.* Moreover, Mr. Watson denial that he opened his cellular telephone was plainly contradicted by his own testimony that he did in fact open his cellular telephone during the interrogation, and he repeatedly testified that he doesn't really recall what occurred and that it was "like a blur." Unofficial Hr'g Tr. at 27:3-28:11.

without charge before questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue." (*Id.*). The form also contains a "WAIVER," which provides: "I fully understand the statement warning me of my rights and I am willing to answer questions. I do not want an attorney, and I understand that I may stop answering questions anytime during the questioning. No promises have been made to me, nor have I been threatened in any matter." (*Id.*).

Although Mr. Watson testified that he didn't read the form before he signed it on July 26, 2022 at 1:30 a.m., he admitted he signed the form on that date and time and that his signature is on this form. Unofficial Hr'g Tr. at 34:21-36:15. Further, the Court does not credit Mr. Watson's testimony that he was handed the form inside a folder such that his view of the document he signed was obstructed. Unofficial Hr'g Tr. at 21:4-11. Indeed, Mr. Watson readily admitted that the officers "handed me the paper," which plainly contradicts his prior testimony on this issue. Unofficial Hr'g Tr. at 7:19-15. Mr. Watson's testimony also confirmed that his will was not overborne, as his answers to his counsel's questions were plainly insufficient to demonstrate that his will was overborne. Unofficial Hr'g Tr. at 8:16-23. Similarly, Mr. Watson testified that upon his arrest, "nothing was said to me," which clearly suggests there was no interrogation at the time of his arrest. Unofficial Hr'g Tr. at 15:12-16:1. Mr. Watson further agreed with the Government that at the time of his arrest, officers were under no obligations to immediately Mirandize him. Unofficial Hr'g Tr. at 16:3-25. And after he testified that the officers refused to identify themselves, Mr. Watson acknowledged

5

Corporal Carito did in fact identify himself as a police officer who was investigating drug offenses. Unofficial Hr'g Tr. at 23:7-24.

Corporal Carito credibly testified that he watched Mr. Watson read this form prior to signing it. Unofficial Hr'g Tr. at 49:14-51:19. He further testified that he did not force or threaten Mr. Watson to sign the form. And Mr. Watson was not credible and the Court discounts his statement that he was taken away to jail less than five minutes after signing the form. That was not the case, as testified to by Corporal Carito, Unofficial Hr'g Tr. at 44:22-45:23, and was acknowledged by Mr. Watson during his testimony. Unofficial Hr'g Tr. at 22:21-24. After signing the form, Mr. Watson was interviewed for approximately two hours and knowingly and voluntarily waived certain of his rights. He was not coerced into signing the form and waiver. He was not coerced into speaking with the police. And he was not coerced into waiving his right to an attorney to be present during his interrogation. At bottom, there is simply no evidence that Defendant was coerced in any way. Unofficial Hr'g Tr. at 41:17-25. He did not ask the officers any questions, which the Court finds significant because at no point did Mr. Watson testify that he asked for lawyer or that he did not want to speak with the police. Unofficial Hr'g Tr. at 24:25-25:23.

When questioned by the Court, Mr. Watson and the Court engaged in the following exchange, which the Court finds not credible and preposterous:

Q: Mr. Watson, is a copy of the Miranda rights warning and waiver before you?

A: Yes.

Q:  Is that your signature?

A:  Yes.

Q:  On the document?

A:  Yes.

Q:  Did you read the document before you signed it?

A:  No.

Q:  You signed this without reading it?

A:  Yes.

Q:  Did anyone ask you to read it?

A:  No.

Q: Did anyone read it to you?

A:  No.

Q:  So somebody simply handed this to you and said, sign it, and you signed it?  Is

that what you're telling me?

A:  Yes, because I believed I was going home after I signed it.  It was like, Man, let's

get him out of here.  Sign it.  So I just signed it.

Q:  You didn't care what was in it?

A:  I didn't think it was a Miranda document, that never even crossed my mind, but I

didn't care, no, I was trying to get out of there.

Q: It says in bold print at the top of the page, Rights, warnings and waiver. Did you see that?

A: No.

Q: Didn't see that, either?

A: No, because the way it was handed to me in the folder.

Q: Did you take it out of the folder?

A: No, and that was foolish on my behalf, and I kick myself about it all day.

Q: You signed a document, the contents of which you did not see?

A: Yes.

Q: That's what you're telling me?

A: Unfortunately, yes.

Q: For all you know, this could have been an agreement where you pled guilty, as far as you known. Is that what you're telling me?

A: I wasn't thinking clearly, but, yeah, it could have been anything.

Unofficial Hr'g Tr. at 34:21-36:15.

Accordingly, Mr. Watson was not a credible witness, and there is no evidence before the Court that the police officers engaged in any coercion such as "trickery, psychological pressure, or mistreatment" in relation to Mr. Watson.

Second, the length of interrogation further does not support Mr. Watson's argument that any statements or confessions were involuntary. On or about midnight on July 26,

2022, Mr. Watson was arrested and brought to the Pennsylvania State Police barracks in Lehighton Pennsylvania. Mr. Watson readily admitted that for approximately 1.5 hours he was being evasive with the officers, and he further testified that he was unwilling to cooperate with the officers at this point. Unofficial Hr'g Tr. at 6:3-22, 24:19-24. Yet on or about 1:30 a.m. Mr. Watson knowingly and voluntarily signed the form and waiver and proceeded to speak with police for approximately 2 more hours, for a total of approximately 3.5 to 4 hours. Unofficial Hr'g Tr. at 8:9-11, 34:21-36:15.

Third, the Court must consider the location of the interrogation. The interrogation took place shortly after Mr. Watson's arrest and in an interrogation room at the Pennsylvania State Police barracks in Lehighton Pennsylvania. No party disputes that Mr. Watson was in custody and was not free to leave.

Fourth, there is no evidence of continuity. Mr. Watson was interrogated one time for approximately 3.5-4 hours at most and the majority of that time he had already signed the form waiving his Miranda rights.

Fifth, the Court finds that the Defendant is a mature individual. He is an adult man over thirty-five years of age and is a father. Unofficial Hr'g Tr. at 8:16-23, 25:11-18. The Court agrees with the Government that Mr. Watson presents himself as an educated and articulate person. Moreover, Mr. Watson testified regarding his prior run-ins with law enforcement, including that he was aware of Miranda warnings, having received them from the police at least two times on prior occasions. Unofficial Hr'g Tr. at 13:2-15:11. He further

9

agreed with the Government that at the time of his arrest, officers were under no obligations to immediately Mirandize him. Unofficial Hr'g Tr. at 16:3-25.

Sixth, the physical condition of the Defendant also does not support a finding that any statement or confession was involuntary.  Mr. Watson admitted that no police officers physically abused or assaulted him.  Unofficial Hr'g Tr. at 18:16-19.  Mr. Watson testified that he had a few abrasions on his nose from wood chips in a motel parking lot he allegedly obtained during his arrest and pain on his wrists due to the use of handcuffs. Unofficial Hr'g Tr. at 17:1-17:25.  However, Mr. Watson admitted that he was not in any severe pain at the time he sustained these abrasions.  *Id.*  Mr. Watson was not suffering from nausea or dizziness, but instead testified that he was merely "stressed out."  Unofficial Hr'g Tr. at 18:1-10.

Seventh, there is no evidence whatsoever that Mr. Watson has any mental health issues or otherwise suffers from any intellectual disability.  Mr. Watson presented neither evidence nor testimony on this issue.  The Court agrees with the Government that Mr. Watson presents himself as an educated and articulate person and does not present himself as mentally ill or otherwise intellectually disabled.  The fact that he expressed concerns for his children and that he was "stressed out" does not lead to the conclusion that Mr. Watson's mental state was such that his will was overcome thus rending any statements to the police officers involuntary.

Finally, the Court must consider whether the police officers advised Defendant Watson of his *Miranda* rights—specifically, his right to remain silent and his right to be represented by an attorney during a custodial interrogation.

Initially, the Government has represented that it does not intend to offer evidence or testimony concerning Mr. Watson's statements prior to his signing of a *Miranda* waiver. More specifically, Corporal Carito testified at the hearing as follows:

Q:  So is it fair to say, Corporal Carito, that hour and a half or so, prior to Mr. Watson signing the Miranda warning, that you were engaged in this back and forth with him, where he was asking you or you were offering information about the potential for him to cooperate?

A:  Yes.

Q:  Did you ask him any substantive questions or interrogate him, in any way, prior to him signing that Miranda warning?

A:  No, in fact, there were several moments that I recall where information began to be discussed that I envisioned becoming somewhat incriminating or something that involved what was occurring that night and I attempted to deflect—deflect is not the right word—I attempted to bring Mr. Watson's attention back to the Miranda form, which, as I recall, was lying on the table for quite some period of time.  It is not—I do not dispute the fact that we certainly did have this hour—approximately, hour and half long conversation, back and forth, before he, in fact, agreed to sign this form.

Q:  Are any of the statements that you and I have discussed in preparation for your

testimony during this trial, are any of those statements that are inculpatory that Mr.

Watson gave that you would proffer or that you would testify to on your direct

examination, are any of those statements statements that were taken from Mr.

Watson, prior to him acknowledging his Miranda warnings and agreeing to speak

with you?

A:  No.

Q:  Do you recall Mr. Watson ever telling you he didn't want to speak to you?

A:  No, I do not.

Q:  Do you recall Mr. Watson ever asking for an attorney?

A:  No.

Q:  Do you recall Mr. Watson, in any way, ever indicating to you that he had an

attorney or that he was indigent and wanted to know if you could help him obtain an

attorney?

A:  No.

Unofficial Hr'g Tr. at 40:15-41:25.

Equally clear is that on July 26, 2022 at 1:30 a.m. Mr. Watson knowingly and

voluntarily signed a form from the Pennsylvania State Police entitled "RIGHTS WARNING

AND WAIVER."  Gov't Ex. 22.  Although Mr. Watson testified that he didn't read the paper

before he signed it on July 26, 2022 at 1:30 a.m., he admitted he signed the paper and his

signature is on this form. Unofficial Hr'g Tr. at 34:21-36:15. Corporal Carito credibly testified that he watched Mr. Watson read this form prior to signing it. Unofficial Hr'g Tr. at 49:14-51:19. He further testified that he did not force or threaten Mr. Watson to sign the form. And Mr. Watson was not credible and the Court discounts his statement that he was taken away to jail less than five minutes after signing the form. After signing the form, Mr. Watson was interviewed for approximately two hours and knowingly and voluntarily waived his rights to remain silent and to his right to counsel, among others.

In sum, the Court has considered the testimony and evidence before it. It finds the account of the events on July 26, 2022, offered by Defendant Watson was entirely without credibility. The Government has met its burden to demonstrate that, based on the totality of the circumstances, any statements and/or confessions made by Mr. Watson were made both knowingly and voluntarily and not in violation of Mr. Watson's Fifth Amendment rights to due process and his privilege against self-incrimination. Accordingly, Mr. Watson's motion to suppress based on alleged violations of his Fifth Amendment rights will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge